COMMONWEALTH vs. EDWARD HESKETH.

Middlesex. January 6, 1982. — May 6, 1982.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Constitutional Law*, Confrontation of witnesses, Self-incrimination. *Witness*, Self-incrimination. *Practice, Criminal*, Disclosure of defense witnesses. *Evidence*, Cross-examination, Impeachment of credibility.

The defendant in a criminal case had no right, under either art. 12 of the Massachusetts Declaration of Rights or the Sixth Amendment to the United States Constitution, to have a prospective defense witness invoke his privilege against self-incrimination before the jury. [156-157]

At a criminal trial, the judge's announcement, during empanelment of the jury, that a certain witness would testify for the defense was not reversible error where, in response to a question from the jury, the judge adequately instructed them that they should draw no inference from the absence of any witness who he had announced would appear; nor, in the circumstances, did the judge's announcement give sufficient reason for allowing the defendant to have the prospective witness invoke his privilege against self-incrimination before the jury. [157-160]

The judge at a criminal trial did not impermissibly restrict the defendant's right to cross-examine the victim as to a statement made by him to the defendant in a courthouse corridor, where the statement did not plainly contradict the victim's testimony-in-chief. [160-161]

At a criminal trial it was not error to exclude questions to a police officer intended to elicit police suspicions which led them to include the photograph of a particular individual in the array of photographs from which the victim selected that of the defendant. [161-162]

On cross-examination of two defense witnesses at a criminal trial it was proper for the prosecutor to inquire whether the witnesses had furnished police with their exculpatory statements, where the jury could have concluded that the witnesses, close long-time friends of the defendant, would have naturally wished to exonerate him. [162-164]

INDICTMENTS found and returned in the Superior Court Department on April 4, 1979.

The cases were tried before *Connolly*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Michael A. Lappin* for the defendant.

*Carmel A.J. Motherway,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J.   The defendant Edward Hesketh was convicted of assault and battery by means of a dangerous weapon (a baseball bat) and malicious destruction of property.[1]   On appeal, the defendant claims error in (1) the judge's refusal to allow a witness for the defense to invoke the privilege against self-incrimination in front of the jury; (2) the exclusion of two questions on cross-examination during the trial; and (3) the judge's decision to allow the prosecution to use the failure to report exculpatory information to law enforcement officials to impeach two defense witnesses.   We affirm.

At trial, the main issue was whether one John Roberts or the defendant committed these crimes.   All of the defendant's claims of error bear on the issue of identification.   We summarize the evidence in light of the identification issue.   At approximately 6 P.M. on January 2, 1979, the victim and his brother were sitting in an automobile parked at the Western Junior High School in Somerville.   Edward Hesketh, John Roberts, Joseph Costa, Joseph Dixon, and William Ghiozzi were seated in a nearby automobile.   A man came out of that automobile and asked the victim if he knew someone.   The victim indicated that he did not recognize the name, and the man told the victim to leave.   When the victim refused to leave, the man smashed the windshield of the victim's automobile with a baseball bat owned by the defendant.   Glass from the windshield fell on the victim and scraped him.

---

[1] The defendant was sentenced to six months in a house of correction on each indictment.   The sentences were suspended, and the defendant was placed on probation for two years.   Restitution in an amount to be determined by the probation department was ordered on the conviction for malicious destruction of property.   Pursuant to Mass. R. Crim. P. 31, 378 Mass. 902 (1979), the judge stayed the order of restitution pending appeal.

The automobile from which the assailant came drove away. The victim followed in his automobile. He obtained the registration number and went to the Somerville police station. At the station, the police showed the victim several albums containing 400 photographs. The victim did not identify the attacker from those photographs.

Sometime later, the victim was shown twelve loose photographs. These photographs included pictures taken from the albums the victim had seen the night of the crimes. In addition, there were two new photographs, one of Roberts and one of the defendant. The victim selected the photograph of the defendant as the man who smashed his windshield. The victim also made an in-court identification of the defendant.

1. *Witness taking Fifth Amendment in front of the jury.* On February 4, 1980,[2] defense counsel told the court that he planned to call Roberts as a witness. The defendant's lawyer claimed that Roberts committed the crime and asked the court to appoint counsel to advise Roberts on the privilege against self-incrimination. The judge (not the trial judge) appointed an attorney to represent Roberts.

Immediately before trial, defense counsel informed the trial judge that he planned to call Roberts as a defense witness. Defense counsel told the judge that it was his understanding that Roberts might invoke the privilege against self-incrimination. He said that he planned to call Roberts as a witness before the jury. Counsel for the defendant told the judge that he had a right to have Roberts invoke the Fifth Amendment privilege before the jury. Defense counsel told the judge that he thought "there's even a case on point." The judge took the matter under advisement and the empanelment commenced.

During the empanelment, the judge told the prospective jurors the names and addresses of all the witnesses who would testify for the prosecution, and the names and addresses of the witnesses who would appear for the defense.

[2] The trial took place in June, 1980.

The judge informed the potential jurors that Roberts would testify for the defense. The defendant did not object.

After the prosecution completed its case, the judge conducted a voir dire outside the presence of the jury to determine whether Roberts intended to invoke the privilege against self-incrimination and whether the privilege was properly invoked. If Roberts planned to take the Fifth Amendment, the judge ruled that Roberts would not be allowed to do so in front of the jury, and that Roberts could not be called as a witness merely to invoke the privilege.

Defense counsel agreed that the privilege was properly invoked. However, he objected to that portion of the ruling which did not permit Roberts to invoke the privilege in front of the jury. Citing art. 12 of the Declaration of Rights of the Massachusetts Constitution, and the Sixth Amendment to the United States Constitution, the defendant's attorney argued that Hesketh had a right to have Roberts invoke the privilege against self-incrimination in front of the jury.[3] The judge did not agree and denied the defendant's request to have Roberts invoke the privilege before the jury. There was no error.

"[T]he right to confront and to cross-examine [witnesses] is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Commonwealth* v. *Francis*, 375 Mass. 211, 214, cert. denied, 439 U.S. 872 (1978), quoting *Chambers* v. *Mississippi*, 410 U.S. 284, 295 (1973), and cases cited. "The Fifth Amendment privilege against self-incrimination, when properly invoked, is clearly one of those interests." *Commonwealth* v. *Francis, supra.* Therefore, the Sixth Amendment does not give the defendant the right to have a witness invoke the privilege against self-incrimination in front of the jury.

The Sixth Amendment "must be considered in light of its purpose, namely to produce testimony for the defendant. . . .

---

[3] Neither in the trial court nor in this court did the defendant make a separate argument based on art. 12 of the Declaration of Rights. We therefore discuss this issue solely on the basis of Federal constitutional law.

Calling a witness who will refuse to testify does not fulfill [that] purpose." *United States* v. *Roberts*, 503 F.2d 598, 600 (9th Cir. 1974), cert. denied, 419 U.S. 1113 (1975). *Dodd* v. *State*, 236 Ga. 572, 576 (1976). Further, a witness's reliance on the Fifth Amendment "may have a disproportionate impact upon the minds of the jurors." *People* v. *Thomas*, 51 N.Y.2d 466, 472 (1980). "The jury may think it high courtroom drama of probative significance when a witness 'takes the Fifth.' In reality the probative value of the event is almost entirely undercut by the . . . fact that it is a form of evidence not subject to cross-examination." *Bowles* v. *United States*, 439 F.2d 536, 541-542 (D.C.Cir. 1970), cert. denied, 401 U.S. 995 (1971). Because the impact of a witness's refusal to testify outweighs its probative value, "[i]t is well settled that the jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense." *Bowles* v. *United States, supra* at 541. *United States* v. *Lacouture*, 495 F.2d 1237 (5th Cir.), cert. denied, 419 U.S. 1053 (1974). *Commonwealth* v. *Greene*, 445 Pa. 228, 231 (1971). *Faver* v. *State*, 393 So. 2d 49 (Fla. App. 1981). See *Commonwealth* v. *Martin*, 372 Mass. 412 (1977). Cf. *Commonwealth* v. *Spencer*, 212 Mass. 438, 452 (1912); *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. 73, 80 (1978).

As we read the record, the defendant's insistence on calling Roberts as a witness was solely for the purpose of creating an inference of guilt to be drawn by the jury from Roberts' assertion of the privilege against self-incrimination. This he cannot do. "[A] defendant has no right to put a witness on the stand simply to require him to assert his Fifth Amendment privilege before the jury." *United States* v. *Reese*, 561 F.2d 894, 899 (D.C.Cir. 1977). *United States* v. *Espinoza*, 578 F.2d 224, 228 (9th Cir.), cert. denied sub nom. *Oropeza-Briones* v. *United States*, 439 U.S. 849 (1978). *Williams* v. *State*, 600 P.2d 1092, 1093 (Alas. 1979).

On appeal, the defendant bases his claim of error on a somewhat different theory. The defendant concedes that

ordinarily a witness should not exercise the privilege against self-incrimination in front of the jury. *Commonwealth* v. *Martin*, 372 Mass. 412, 421 n.17 (1977). *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. 73, 79 (1978). Nevertheless, the defendant argues that a trial judge should allow a witness to take the Fifth Amendment in front of the jury when there is a legitimate reason to do so. *Commonwealth* v. *DiPietro*, 373 Mass. 369, 390 (1977).[4] The defendant asserts that in this case the judge's announcement during the empanelment that Roberts would testify for the defense is a sufficient reason.

Relying on *Commonwealth* v. *Bolduc*, 383 Mass. 744 (1981), the defendant claims that the judge erred when he told the jury the names of the witnesses who would testify for the defense. In light of this error, the defendant argues that the judge should have permitted Roberts to invoke the privilege against self-incrimination in front of the jury. Thus, the defendant asserts that by excluding Roberts as a witness, the judge left the jury speculating as to why Roberts did not appear as a witness for the defense.

In support of his argument, the defendant asserts that after deliberations began, the jury returned with a question. The jury asked for the identity of the persons who they were told would appear.[5] In response, the judge forcefully in-

---

[4] In *Commonwealth* v. *DiPietro*, 373 Mass. 369, 390 (1977), the judge allowed the defendant's wife to invoke the spousal privilege in front of the jury. The Commonwealth had to put the defendant's wife on the stand to invoke the spousal privilege to prove that she was unavailable before it could introduce prior recorded testimony.

A witness who successfully invokes the privilege against self-incrimination is unavailable. See *Commonwealth* v. *Carr*, 373 Mass. 617, 624 (1977). Thus, the defendant could have introduced any prior recorded statements that Roberts made as well as any declarations against his penal interest. However, the defendant made no attempt to introduce such statements.

[5] In addition to the witnesses who did testify and Roberts, the jurors were also told that one George Ingals would testify. Ingals did not testify. The record indicates that Ingals would have testified to the confrontation between Hesketh and the victim in the courthouse corridor (part 2A, *infra*). The record reflects that the information was made known to the judge at a bench conference but was not made known to the jury.

structed the jury that they should not draw any inference from the presence or the absence of a witness whom he announced would appear for either side.[6] The defendant moved for a mistrial but he did not object to the instructions.

Since the defendant did not object to disclosing his witnesses, the only issue under *Bolduc* is whether the naming of Roberts as a defense witness denied Hesketh "any Federal or State constitutional right."[7] *Commonwealth* v. *Bolduc,* 383 Mass. 744, 747 (1981). We conclude that it did not. The defendant was able to put his defense before the jury through his own witnesses and through vigorous cross-examination of witnesses for the Commonwealth. In these circumstances, the refusal to permit Roberts to invoke the privilege before the jury did not deny the defendant a fair trial. Cf. *Chambers* v. *Mississippi,* 410 U.S. 284, 294-295 (1973). Indeed, the defendant makes no such argument in this court.

Moreover, in this case, the judge instructed the jury that they may draw no inference from a witness's absence. "We presume, as we must, that a jury understands and follows limiting instructions." *Commonwealth* v. *Jackson,* 384 Mass. 572, 579 (1981). We, therefore, conclude that there is no reversible error. We repeat, however, that judges should not indicate to the jury which witnesses will testify for the prosecution and which for the defense. Instead, the judge should identify "the potential witnesses of both parties

---

[6] The judge instructed the jury as follows: "The persons whose names were recited to you as potential witnesses in the trial were given to you solely for the purpose of screening out of the venire of jurors, those who might be related to or know any of the witnesses. If there is any witness for the Commonwealth or any witness for the defendant named in the list that I read to you who did not appear, you are to draw no inferences from that fact. You may draw no inferences from the presence or the absence of any witness who appeared for either side."

[7] We do not believe that "any constitutional implications present in the *Bolduc* decision would help the defendant here, because the *Bolduc* rule would not appear to qualify for application to cases tried prior to the date of the decision under the specific criteria enumerated in *Reddick* v. *Commonwealth,* 381 Mass. 398, 400-402 (1980)." *Commonwealth* v. *Pasciuti,* 12 Mass. App. Ct. 833, 836 (1981).

at one time without stating whose potential witnesses they are." *Commonwealth* v. *Bolduc,* 383 Mass. 744, 747 (1981).

2. *Exclusion of questions during cross-examination.*

A. The defendant claims error in the exclusion of a statement made by the victim to the defendant in the corridor of the courthouse. The defendant approached the victim and said that Roberts is the person who smashed the windshield. The victim's response according to the defendant was, "All I want is my money for my windshield."

The judge excluded the evidence, because he determined that the statement only meant that the victim was "selfishly interested in getting reimbursed for the damage to his car, but it [did not] mean that [the victim was not] sure of his identification."[8]

The defendant concedes that the victim's statement did not in plain terms contradict his (the victim's) testimony. But, the defendant argues that the "circumstances [in] which [the statement] was made, tended to qualify or control the trial testimony of the witness and bore upon the main issue of the trial — this witness's identification of the defendant as being the assailant." The defendant, therefore, concludes that the judge impermissibly restricted his right of cross-examination. We do not agree.

As a matter of right, a defendant is entitled to reasonable cross-examination of witnesses to show bias or prejudice. *Commonwealth* v. *Russ,* 232 Mass. 58, 79 (1919). The correlative rule is that "the scope of cross-examination, including to what extent the accuracy, veracity, and credibility of a witness may be tested, rests largely in the sound discretion of the judge, not subject to revision unless prejudice is shown to a party by reason of too narrow restriction or too great breadth of inquiry." *Commonwealth* v. *Smith,* 329 Mass. 477, 479 (1952). However, "it is not necessary that

---

[8] The judge did not exclude this evidence on the ground that, as a matter of public policy, persons accused of crime should be deterred from confronting and possibly intimidating witnesses in the courthouse environs. Hence, we do not discuss this issue.

there should be a contradiction in plain terms. It is enough if the proffered testimony, taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict." *Commonwealth* v. *West,* 312 Mass. 438, 440 (1942). The wide discretion of the trial judge "has no application where alleged contradictory statements of a witness relate to the main issue that is being tried." *Commonwealth* v. *A Juvenile,* 361 Mass. 214, 218 (1972). Where, however, as here the statements are not plainly contradictory, the judge has wide discretion. There was no error.

B. On the night of the crimes, the victim examined well over 400 photographs, but was unable to make identification. According to one officer, approximately eighteen days later,[9] the victim selected the defendant's photograph from an array of twelve color photographs, including two new photos, one of the defendant, and one of Roberts. On cross-examination, defense counsel attempted to ask a police officer the reason for the inclusion of Roberts' picture. The judge excluded these questions. At a bench conference, the defendant claimed that he could ask the officer if Roberts was the police's prime suspect.[10] The judge ruled that whether the police thought that Roberts "was the prime suspect . . . is not material in this case . . . [and that the jurors are] not entitled to know the prime suspect . . . of the police officer." There was no error. It is fundamental that "[n]o witness should be permitted to give his opinion directly that a person is guilty or innocent . . . . [S]uch matters are not subjects of opinion testimony. The [opinions as to guilt or innocence] are mixed questions of law and fact . . . and the jury must draw its own conclusion from the evidence." *Gris-*

---

[9] The victim claimed that the photo identification took place closer to the incident.

[10] On appeal, the defendant relies on *Davis* v. *Alaska,* 415 U.S. 308 (1974). As we read *Davis* v. *Alaska,* we conclude that it is not applicable to these facts. The excluded question was not designed to elicit police bias against the defendant.

*more* v. *Consolidated Prods. Co.*, 232 Iowa 328, 361 (1942). See generally P.J. Liacos, Massachusetts Evidence 96 (5th ed. 1981). A witness's belief as to how the case should be decided is not admissible. "There is no necessity for this kind of evidence; to receive it would tend to suggest that the judge and jury may shift responsibility for decision to the witnesses." McCormick, Evidence § 12, at 26-27 (2d ed. 1972). We are unwilling to denigrate the role of the jury in our constitutional scheme. To allow the police to testify as to their suspicions would seriously undermine the constitutional protections afforded to all citizens.

3. *Impeachment of the defense witnesses.* Two defense witnesses, Costa and Ghiozzi,[11] testified that they observed Roberts smash the windshield. In cross-examination, both witnesses admitted that they were long-time[12] close personal friends of each other and of the defendant Hesketh.[13] On cross-examination, both witnesses were asked if they ever told police that Roberts was the culprit. The defendant did not object. Both witnesses admitted that they had not talked to the police. Each witness was asked if he "talk[ed] to anyone in the District Attorney's office." Ghiozzi answered, "No." The defendant objected. Costa does not appear to have answered the question. However, at that time, the judge instructed the jury that the witness was "under no obligation to talk to anyone, the police or the District Attorney's Office. . . . [T]he Jury should understand that [the witness is] under no obligation to talk to these people."

The defendant did not object to these instructions. He did not request further instructions. Costa again was asked if he spoke to the police. Again the defendant did not object. Costa repeated that he never talked to the police.

---

[11] The other man in the automobile, one Joseph Dixon, apparently was stationed in Germany at the time of the trial.

[12] Ghiozzi said that he had been a friend of the defendant for fifteen years. Costa said that he and the defendant had been friends for eighteen years.

[13] The defendant said that the three men (Dixon, Costa, and Ghiozzi) were "like brothers to me."

Assuming, without deciding, that the defendant's objections are timely, we conclude that there is no error. "The thrust of the questioning was to suggest that [Costa and Ghiozzi] both had prior opportunity to tell their stories to Commonwealth representatives and did not do so. This was a proper mode of impeaching these witnesses by showing recent contrivance or bias in favor of the defendant." *Commonwealth* v. *Cefalo*, 381 Mass. 319, 338 (1980). See *Commonwealth* v. *Nickerson*, 385 Mass. 54, 58-59 & n.5 (1982).[14] "A witness's silence in such circumstances is akin to a witness's 'prior inconsistent statement,' and, therefore, has probative value." *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 296 (1981).

A prosecutor, however, must lay a foundation for this type of impeachment by showing that it would have been natural for the witness to report his exculpatory information to the police. In this case the prosecutor built this foundation by demonstrating that the witnesses Costa and Ghiozzi "had reason to recognize that [they] possessed exculpatory information [and] had a reasonable motive for acting to exonerate the defendant." *People* v. *Dawson*, 50 N.Y.2d 311, 321 n.4 (1980). They were present at the scene of the crime. They had been close personal friends of the defendant for at least fifteen years. Both men continued to see Hesketh after the incident.

From these facts, the jury could have concluded that it would have been natural for Costa and Ghiozzi to go to the police and tell them that Roberts smashed the windshield, and that their failure to do so cast doubt on their in-court testimony that Roberts was the assailant.[15] "[T]he natural impulse of a person possessing exculpatory information

---

[14] There are different considerations when the prosecution relies on the failure to go to law enforcement authorities to impeach a defendant in a criminal case. See *Commonwealth* v. *Nickerson*, *ante* 54, 58-59 & n.5 (1982). *Fletcher* v. *Weir*, 455 U.S. 603 (1982) (per curiam).

[15] Costa testified that he never told anyone what happened until the morning of the trial.

would be to come forward at the earliest possible moment in order to forestall the mistaken prosecution of a friend or loved one. In such situations, the failure to speak up at a time when it would be natural to do so might well cast doubt upon the veracity of the witness' exculpatory statements at trial." *People* v. *Dawson*, 50 N.Y.2d 311, 318 (1980). See *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 296 (1981); *People* v. *Diaz*, 98 Mich. App. 675 (1980); *People* v. *McClow*, 40 Mich. App. 185 (1972). See also *Assessors of Pittsfield* v. *W.T. Grant Co.*, 329 Mass. 359 (1952); *Hill* v. *Crompton*, 119 Mass. 376, 382 (1876); P.J. Liacos, Massachusetts Evidence 136 (5th ed. 1981). We therefore conclude that the judge did not err in allowing the prosecutor to cross-examine Costa and Ghiozzi on their failure to go to the authorities.

*Judgments affirmed.*