## COMMONWEALTH vs. DANIEL G. GAGNON.

Suffolk. May 9, 1990. - July 30, 1990.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Evidence*, Impeachment of credibility, Relevancy and materiality, Cross-examination, Bias, Hearsay, Declaration against interest. *Homicide. Practice, Criminal*, Instructions to jury, Judicial discretion, Required finding, Capital case. *Due Process of Law*, Declaration against interest. *Constitutional Law*, Confrontation of witnesses, Self-incrimination. *Witness*, Self-incrimination. *Conspiracy. Burning of Property*.

At a murder trial in which a defense witness testified that a certain individual had admitted to him that he, and not the defendant, had shot the victim, no prejudicial error appeared in the judge's allowing the prosecutor to cross-examine the witness in order to demonstrate that his testimony was a recent contrivance, to suggest the witness's bias, and to impeach the witness's credibility. [190-193]

At a murder trial there was no error in the judge's giving, on her own initiative during the testimony of a certain defense witness, an instruction to the jury on their function in determining the credibility of the evidence. [193-194]

Where a criminal defendant sought to call a witness to the stand solely in order for the witness to invoke his privilege under the Fifth Amendment to the United States Constitution not to testify before the jury, the judge correctly ruled that the witness could not be presented; the defendant's rights to produce evidence under the Sixth Amendment or under art. 12 of the Declaration of Rights of the Massachusetts Constitution were not implicated, as calling that witness to the stand would not produce any relevant evidence. [194-198]

At a murder trial no error was demonstrated in the judge's admitting in evidence a .38 caliber cartridge case found on a shelf in the defendant's bedroom, four days after the shooting, which was of a type consistent with that of the projectile recovered from the victim's body. [199-200]

Evidence at a criminal trial was sufficient to permit a finding of a conspiracy between the defendant and another to burn a motor vehicle. [200-202]

INDICTMENTS found and returned in the Superior Court Department on December 16, 1986.

The cases were tried before *Sandra L. Hamlin*, J.

*William P. Homans, Jr.*, for the defendant.

*Sharon B. Soffer*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree, unlawfully carrying a firearm, and conspiracy to burn a motor vehicle. On appeal, the defendant claims error in (1) the examination of John Butler, a defense witness who testified that Louis Marotta had admitted that he, not the defendant, had shot the victim; (2) the judge's rulings in connection with defense counsel's efforts to show before the jury that Marotta had claimed his privilege against self-incrimination, to comment on Marotta's absence as a witness, or to show that Marotta had been nonresponsive to a subpoena to testify at the trial; and (3) the admission in evidence of a spent cartridge. The defendant also claims that there was insufficient evidence to convict him of the conspiracy charge. We reject the defendant's claims and affirm the convictions. We also conclude that there is no basis to exercise our power under G. L. c. 278, § 33E (1988 ed.), to direct the entry of a verdict of a lesser degree of guilt or to order a new trial in connection with the murder conviction.

The Commonwealth presented evidence to the jury of the following. In the early evening of September 28, 1986, the victim, a thirteen year old boy, was sitting with two friends, Paul Carpenter,[1] thirteen, and Michael Vincent, eleven, on the front porch of Carpenter's home in Revere. A fourth boy, eight year old Michael Bruno, was leaning against a gray Chrysler automobile parked in front of the house. A man approached Bruno and told him "to get off his car." Carpenter testified that he recognized this man as the defendant, whom he believed to be the stepfather of another boy who lived on

---

[1] We have assigned fictitious names to the boys involved in the case.

Commonwealth v. Gagnon.

the street. The defendant then got into his car and drove away.

A few minutes later, Carpenter, Vincent, and the victim walked across the street to do "pull-ups" on a fence. As they approached an alley between two houses, the boys encountered the defendant and another man, later identified as Louis Marotta. Carpenter described Marotta as approximately five feet eight inches tall, heavy set, dark haired, and shorter than the defendant. Carpenter described the defendant as having a beard and moustache, while Marotta had no facial hair. Vincent described the defendant as about six feet tall, thin, with brown hair, moustache, and beard. The defendant asked the boys if they had been throwing rocks at Marotta's car, which they denied.

At that point a neighbor, Lisa Wilson, arrived at the scene and asked what was going on. Wilson testified that the taller of the two men, neither of whom she recognized, told her that the boys had been throwing rocks at a car. Wilson described this man as having blondish hair and a moustache. After the boys again denied throwing the rocks, Wilson turned and started walking home.

As she turned to walk home, Wilson heard the taller man say, "You think it's funny? I'll blow your f'n brains out."[2] Vincent testified that the defendant said "that he was going to blow our brains out," and both Vincent and Carpenter reported hearing the defendant ask, "Do you want me to kill you with my hands or with a gun?"[3] The defendant then raised his hand to the victim's face and shot him just beneath the left eye.

With regard to more particular detail, both Vincent and Carpenter testified that they saw the defendant shoot the victim. Vincent stated that he saw the defendant with a gun in his hand, and as he ran away, turned and observed the

---

[2] Although she did not see which man made this threat, Wilson recognized the voice as that of the taller man, who, she testified, had done most of the talking and yelling previously.

[3] None of these witnesses reported hearing Marotta make any threat.

"flash" of the gun and the victim fall to the ground. Carpenter testified that he saw the defendant "put his hand next to [the victim's] face" when he saw a "flash" and the victim fall to the ground. Carpenter then saw the defendant flee the scene with Marotta close behind him. This is the primary evidence on which the Commonwealth relied. We shall relate additional facts and evidence, including the evidence pertaining to the defendant's conviction for conspiracy to burn a motor vehicle, as we discuss the various claims of error.

1. *Examination of John Butler.* The defendant contended at trial that Louis Marotta had shot the victim. To support that contention, he called as a witness John Butler. Butler testified on direct examination that he had met a man known to him as "Louis" through his (Butler's) former girl friend, Mary Quish, and that he had seen "Louis" occasionally over a six-year period. Butler indicated that he read a news article contained in the Thursday, January 14, 1988, edition of the Boston Herald newspaper. That article (which was admitted in evidence) described the start of the trial and the opening statements of counsel. In particular, the piece stated that defense counsel had told the jury that the defense "would prove [that the defendant's] cohort, twenty-three year old Louis Marotta, Junior of Hyde Park had fired the gun."

According to Butler, the news article stimulated his memory as to an incident that had occurred in the fall of 1986. Butler stated that at that time he had been at a liquor store in Hyde Park to buy liquor when he heard a voice from a parked car say "Hi, Jackie. How ya doing?" Butler saw the man known to him as "Louis" in the backseat of the car with a gun in his hand. Butler testified that Marotta then stated that he was "on the run [because] he just shot some kid."

Based on the news article, Butler called his former girl friend, Quish, and learned that "Louis's" last name was Marotta. He then went to the police and picked out Marotta's picture from a photographic display. Finally, Butler indicated in his direct examination that he had not initially believed Marotta's statement because he thought Marotta was just attempting to act "[m]acho."

As might be expected, the prosecutor's cross-examination of Butler was vigorous. The defendant now claims that four aspects of that cross-examination were improper and that the judge should not have instructed the jury during Butler's testimony on the subject of witness credibility.

(a) As has been indicated, Butler testified on direct examination that a news article about the trial in the January 14, 1988, edition of the Boston Herald revived his memory with respect to Marotta's alleged statement against penal interest. On cross-examination, Butler admitted that he had told the police that there were certain news stories in the media that he had followed and that the victim's murder was one such story. Butler also reiterated that he did not connect Marotta's name to the incident until he read the Boston Herald article of January 14, 1988. Butler admitted, however, that he was a "regular reader" of that newspaper.

Based on this background, the prosecutor confronted Butler with a news article in the Boston Herald of Friday, January 30, 1987, which contained virtually the same information as the article printed about one year later. Butler was asked to read the article to himself. Objection was made at sidebar to any use of the article on the ground that proper foundation required preliminary acknowledgement by Butler that he had read the 1987 article prior to trial. The judge permitted the examination to continue in view of the "prominen[ce]" of the article and Butler's testimony that "he [had] followed this case in the newspaper," but she instructed the prosecutor to "lay more of a foundation." The prosecutor continued his cross-examination, pointing out that the article before Butler identified Louis Marotta and the defense claim that Marotta, not the defendant, had been the shooter. Further objections as to foundation were made and overruled. Butler, however, indicated in response to a question by the prosecutor about his failure to come forward sooner with his information about Marotta: "No. I didn't read that [the January 30, 1987] article. Reading the newspaper is not a religion. I just pick it up and follow Larry Bird's career." Shortly after this answer, the prosecutor suspended inquiry on the 1987 article.

The defendant argues that cross-examination of Butler about the 1987 news article should not have been permitted without a statement by Butler that he had read the article. In the defendant's view, the questioning that occurred was unfair and prejudicial. We do not agree.

The prosecutor was obviously entitled to suggest that Butler's direct testimony was recently contrived and that Butler, in fact, had known of the information about Marotta much earlier. See *Commonwealth* v. *Nickerson*, 386 Mass. 54, 57-58 (1982); *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 295-296 (1981). The inquiry about the 1987 article was set against a background of admissions by Butler that he was a regular reader of the Boston Herald and that he had followed news of this particular case in the media. The judge appears to have allowed the questioning about the article de bene, in the expectation that the prosecutor would eventually establish that it would have been natural for Butler to have come forward earlier with his exculpatory information. That expectation was never fulfilled, but Butler did eventually state that he had not read the 1987 article which introduced no new information into the case. Examination on the article stopped with Butler's denial of knowledge about its contents. There was no motion to strike any part of the cross-examination.

The jury could not have been left with any misimpression. They had before them (i) Butler's testimony that the 1988 article had awakened him to the possible significance of Marotta's alleged remarks; (ii) the existence of a 1987 article in the same newspaper containing information about Marotta similar to the 1988 article; (iii) Butler's statement that he was following news of the case and was a regular reader of the newspaper that had published both articles; (iv) Butler's categorical denial; and (v) his explanation that regular reading of the Herald was not a religion and would have been confined to following the careers of certain sports figures. The issue raised by the attempted impeachment — whether it might be possible for even a faithful follower of the story to have missed one article about it in a newspaper

he professed to read — was, we think, something for the jury to consider in weighing the evidence and the over-all credibility of the witnesses. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 745 (1990). This is not a situation in which a prosecutor, without any testimonial foundation, interjected prejudicial material into the trial. Contrast *Commonwealth* v. *Olszewski*, 401 Mass. 749, 759 (1988). We perceive nothing in this claim which might require a new trial.

(b) The defendant also claims that the judge should not have permitted cross-examination of Butler on three other points: physical violence toward Quish, a hypothetical situation, and a "tab" that Butler maintained at a local tavern.

On the first point, Butler testified, as has been indicated, that he met Marotta in 1981 or 1982 through a former girl friend, Mary Quish. He stated that he saw Marotta "occasionally" and that Marotta had visited at Butler's apartment on Harvard Street in Hyde Park, which Quish shared with Butler. According to Butler, Quish had once asked Marotta to install a new lock on the door of the apartment, although the apartment was not Quish's and Butler had not asked Marotta to install the lock. Although Butler denied any physical violence toward Quish, Quish testified that Butler had tried to choke her on the day before she had the lock changed.

The defendant argues that the judge should have sustained his objections to any examination of Butler and Quish about physical violence. The aim of the examination, of course, was to suggest that Butler harbored a bias toward Marotta, and thus was inclined to finger him, because Marotta had become involved with Quish.

The judge had some discretion on the issue. But it is not necessary to decide whether she exceeded that discretion in permitting the examination because the judge decided later that the entire colloquy should be struck from the record. The judge twice instructed the jury in express terms, once before closing argument and once after, to disregard the testimony of Butler and Quish as to any physical violence between them in assessing Butler's credibility. "[W]e shall not

assume that jurors will slight strong and precise instructions of the trial judge to disregard the matters which have been withdrawn from their consideration." *Commonwealth* v. *Gordon*, 356 Mass. 598, 604 (1970). We are satisfied that the judge's strong, precise, and repeated instruction eliminated any problem.

On the second point, the defendant claims that the judge abused her discretion in permitting cross-examination of Butler regarding a hypothetical situation. Butler had testified that he did not immediately report Marotta's statement to the police because he did not think that Marotta was serious. The prosecutor then asked Butler whether he would have reported Marotta's statement if he had thought Marotta was serious. The defendant objected. The defendant contends that "[t]he state of the evidence being that Butler did not believe it when he heard it, the question was entirely hypothetical."

"Parties to litigation are entitled as a matter of right to the reasonable cross-examination of witnesses against them for the purpose of attempting to impeach or discredit their testimony." *Commonwealth* v. *Underwood*, 358 Mass. 506, 513 (1970). "[T]he scope of cross-examination, including to what extent the accuracy, veracity, and credibility of a witness may be tested, rests largely in the sound discretion of the judge, not subject to revision unless prejudice is shown to a party by reason of too narrow restriction or too great breadth of inquiry." *Id.*, quoting *Commonwealth* v. *Smith*, 329 Mass. 477, 479 (1952); *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 593 (1956).

Butler had claimed that his reason for remaining silent was that he did not believe Marotta. The judge properly exercised her discretion in permitting the prosecutor to impeach the witness's account by asking whether Butler would have come forward if he *did* believe Marotta. The prosecutor at sidebar expressly justified his question as bearing on Butler's statement and his state of mind inquiry as part of a broader inquiry tending to suggest recent contrivance. The

exchange was brief and a minor point in a much larger cross-examination. It did not constitute error.

On the third point, the defendant claims that the judge abused her discretion in permitting cross-examination of Butler on a tavern "tab." Butler had testified that he first reported Marotta's statement to the police after he had had "a few" drinks at a tavern where he was a "regular customer." The prosecutor then asked Butler whether he ran a "tab" at the tavern. The defendant objected and argues on appeal that the question was collateral.

It could be argued that the question was properly allowed by the judge, in an exercise of discretion, to show that Butler, as a drinker, might have lacked ability to remember correctly a statement made by Marotta outside a liquor store and first reported to the Boston police one and one-half years later after Butler had had "a few" drinks at a bar where he was a "regular customer." On balance, however, we think it was error to allow the questioning, but conclude that there was nothing in it that prejudiced the defendant.

(c) Finally, the defendant maintains that the judge should not have instructed the jury during Butler's testimony on their function as to determining the credibility of the evidence. During redirect examination, Butler stated that he had come forward because he was concerned that "the wrong person" had been charged. Immediately following this testimony, the judge instructed the jury sua sponte as follows: "Mr. Foreman and ladies and gentlemen, as you know, the credibility and believability of all evidence is for your consideration and that is going to be what you are going to decide." The defendant did not object, but now argues that the unrequested instruction may have improperly told the jury to be more concerned with Butler's credibility than that of other witnesses.

An out-of-court statement made by a person that he, and not the defendant on trial, committed the crime is admissible where: (1) the declarant's testimony is unavailable; (2) the statement tends so far to subject the declarant to criminal liability that a reasonable man would not have made the

statement unless he believed it were true; and (3) the statement, if offered to exculpate the accused, is corroborated by circumstances clearly indicating its truthfulness. See *Commonwealth* v. *Galloway*, 404 Mass. 204, 207-208 (1989); *Commonwealth* v. *Drew*, 397 Mass. 65, 73 (1986). The judge decides whether these conditions are met and, particularly in reference to the third factor, "judges are obliged to exercise a discriminating judgment." *Commonwealth* v. *Drew*, *supra* at 75, quoting *Commonwealth* v. *Doherty*, 394 Mass. 341, 347 (1985). If the issue is close, the judge should favor admitting the statement. "In most such instances, the good sense of the jury will correct any prejudicial impact." *Commonwealth* v. *Galloway*, *supra* at 209.

Here, after admitting Marotta's statement, the judge decided to remind the jury that they are the finders of fact and of credibility. Although the witness had testified on the basis of the statement that the defendant was possibly the wrong man, the judge reminded the jury that the weight accorded all evidence and, in particular, evidence on the decisive issue at trial, was for their determination alone.

Moreover, the judge was expressly directed by law to evaluate the reliability of the proffered statement. If the issue appeared close, she was to favor admission, relying on "the good sense of the jury to correct any prejudicial impact." The instruction could have been given at a later time. The absence of any objection to the instruction by the defendant's experienced trial counsel indicates that it was not perceived by him as offensive. We see no error.

2. *The jury's knowledge of Marotta's claim of privilege.* During the presentation of his case, the defendant sought to call Louis Marotta to the stand. The judge conducted a voir dire, during which she determined that Marotta intended to invoke his Fifth Amendment privilege against self-incrimination, and that he had valid grounds for doing so. The judge thus ruled that Marotta could not be called to the stand to be forced to invoke his privilege before the jury. Defense counsel then moved for permission to comment in his closing on Marotta's absence, by asking the jury to "consider why

[Marotta] was not presented as a witness." The judge denied this motion, ruling that the parties could "argue anything that's in the evidence about Marotta . . . [but that] there is to be no comment by either party on the fact that [Marotta] was not called as a witness before the jury." The judge also denied the defendant's motion to have his subpoena of Marotta admitted in evidence. The defendant now contends that these rulings violated his State constitutional right "to produce all proofs, that may be favorable to him." Art. 12 of the Declaration of Rights of the Massachusetts Constitution.[4]

The defendant recognizes that the argument he makes under the Sixth Amendment to the United States Constitution runs counter to the holding in *Commonwealth* v. *Hesketh*, 386 Mass. 153 (1982). The factual background of *Hesketh* is virtually identical to that of the instant case. The main issue at that trial was whether the defendant or one Roberts had committed the alleged crimes. Prior to trial, the defendant informed the court that he intended to call Roberts as a witness, and that he (the defendant) understood that Roberts would invoke his privilege against self-incrimination. After conducting a voir dire, the judge concluded that, if called to the stand, Roberts would properly invoke the privilege. Accordingly, the judge ruled that Roberts could not be called as a witness, and the defendant claimed constitutional error.

In affirming that defendant's conviction, we reasoned that the "right to confront and to cross-examine [witnesses] is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. . . . The Fifth Amendment privilege against self-incrimination, when properly invoked, is clearly one of those interests" (citations omitted). *Commonwealth* v. *Hesketh*, *supra* at 156, quoting *Commonwealth* v. *Francis*, 375 Mass. 211, 214, cert. denied, 439 U.S. 872 (1978). See *Chambers* v. *Mississippi*,

---

[4]While his claim relies primarily on art. 12, the defendant also alleges violation of his Sixth Amendment right under the United States Constitution "to have compulsory process for obtaining witnesses in his favor."

410 U.S. 284, 295 (1973). Consequently, we held that "the Sixth Amendment does not give the defendant the right to have a witness invoke the privilege against self-incrimination in front of the jury."[5] *Id.*

Because we have previously decided, and repeat today, that the Federal Constitution does not grant the right claimed here,[6] we construe the defendant's argument as a request that we interpret art. 12 of our State Constitution more broadly. In particular, we must determine whether, in order to vindicate a criminal defendant's rights pursuant to art. 12, a judge has discretion to permit a witness to be called to the stand for the sole purpose of invoking his or her privilege against self-incrimination before the jury. For the reasons which follow, we must answer this question in the negative.

The express purpose of art. 12, as is true of the Sixth Amendment's compulsory process clause, see *United States v. Roberts*, 503 F.2d 598, 600 (9th Cir. 1974), cert. denied, 419 U.S. 1113 (1975), is to grant criminal defendants the right to produce evidence which might tend to exculpate them. This objective is not implicated when the testimony or material sought to be produced lacks any probative value as to the defendant's guilt or innocence of the particular crime charged. Such is the case here, where the defendant claims a constitutional right to call Marotta to the stand, fully cognizant of the fact that Marotta, if called, would invoke his privilege and refuse to answer any questions. Marotta's invocation of the privilege could be based on factors wholly unrelated to the crimes with which the defendant is charged, see *People v. Thomas,* 51 N.Y.2d 466, 472 (1980), or, for that matter, unrelated to any criminal conduct whatsoever. See

---

[5]This holding is consistent with those reached by a number of Federal and State courts which have considered the issue. See, e.g., *United States v. Espinoza*, 578 F.2d 224, 228 (9th Cir.), cert. denied sub nom. *Oropeza-Briones v. United States*, 439 U.S. 849 (1978); *United States v. Reese*, 561 F.2d 894, 899 (D.C. Cir. 1977); *United States v. Roberts*, 503 F.2d 598, 600 (9th Cir. 1974); *Williams v. State*, 600 P.2d 1092, 1093 (Alaska 1979); *People v. Dyer*, 425 Mich. 572, 576 (1986).

[6]Our holding in *Hesketh* was based solely on Federal constitutional law. See 386 Mass. at 156 n.3.

*Slochower* v. *Board of Higher Educ.*, 350 U.S. 551, 557 (1956) ("[A] witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing"). Calling Marotta to the stand would not produce any relevant evidence, see *People* v. *Dyer*, 425 Mich. 572, 579 (1986), and thus does not implicate the principles underlying art. 12.

While Marotta's invocation of the privilege against self-incrimination would not furnish the jury with any probative evidence of the defendant's guilt or innocence, that act nonetheless would be highly likely to have a strong and illegitimate impact on the jury's deliberations. See *Bowles* v. *United States*, 439 F.2d 536, 541 (D.C. Cir. 1970) (en banc), cert. denied, 401 U.S. 995 (1971); *People* v. *Thomas*, *supra* at 472. "It has long been recognized that jurors tend to view a witness' invocation of the privilege as a 'clear confession of crime.'" *State* v. *Corrales*, 138 Ariz. 583, 590 (1983), quoting 8 J. Wigmore, Evidence § 2272, at 426 (McNaughton rev. ed. 1961). On these particular facts, "[h]ad [Marotta] testified that he would not answer questions regarding the transaction at issue in this case on grounds that those answers might tend to incriminate him, the jury might have inferred that [Marotta] was covering up because he, not the defendant, was the wrongdoer." *People* v. *Dyer*, *supra* at 575. Were Marotta permitted to invoke the privilege before the jury, the pronounced effect would be to invite the jurors to speculate (1) that Marotta was guilty of some crime; (2) that he was guilty of the particular crime with which the defendant is charged; and (3) that, therefore, the defendant must be innocent of that crime.

Allowing the jury to draw such inferences from a witness's decision to invoke his constitutional rights is improper. The United States Supreme Court has observed that "[t]he privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury." *Slochower* v. *Board of Higher Educ.*, *supra* at 557. Because a witness who exercises his Fifth Amendment right is not admitting guilt, no inferences, either in favor of the prosecutor

or of the defendant, may be drawn from that refusal to testify. See *Commonwealth* v. *Ries*, 337 Mass. 565, 586 (1958); *Bowles* v. *United States*, *supra* at 541; *Billeci* v. *United States*, 184 F.2d 394, 398 (D.C. Cir. 1950). In summary, then, calling Marotta to the stand in the face of his expressed intention to invoke his privilege against self-incrimination would have produced no relevant evidence, while inviting the jury to engage in unwarranted and impermissible speculation.

We therefore conclude that a trial judge has no discretion to permit a witness to appear before a jury for the sole purpose of properly[7] invoking his or her privilege against self-incrimination. Article 12 requires nothing to the contrary. We further conclude that the defendant was not entitled to enter in evidence his subpoena of Marotta, or to ask the jury to consider why Marotta did not testify.[8] Each of these alternatives is merely an indirect attempt to put before the jury information. — namely, the fact that Marotta had invoked his Fifth Amendment privilege not to testify — that we have determined may not be put before them directly. See *Commonwealth* v. *Ries*, *supra* at 585; *Bowles* v. *United States*, *supra* at 542; *People* v. *Thomas*, *supra* at 473. The judge committed no error when she ruled against the defendant on each of these three requests.[9]

---

[7]There is no dispute here that Marotta had proper grounds for invoking his privilege not to testify.

[8]This conclusion rests on the fact that the missing witness had successfully invoked a testimonial privilege, and thus was unavailable to be called as a witness by either party. See *Commonwealth* v. *DiPietro*, 373 Mass. 369, 382 (1977). By contrast, when a witness is not called despite being available, we have permitted, on a case-by-case basis, statements in closing argument requesting the jury to consider why the witness was not called to testify. See, e.g., *Commonwealth* v. *Niziolek*, 380 Mass. 513, 518 (1980); *Commonwealth* v. *Franklin*, 366 Mass. 284, 292-293 (1974).

[9]In appropriate circumstances, a defendant can seek to ameliorate any potential harm to his case by requesting a neutralizing instruction such as the following: "There has been testimony in this case about [a witness] named [John Doe]. As a result of a hearing held outside the presence of the jury, the Court has determined the [Mr. Doe] is not available to be called as a witness by either side in this case. The jury may not draw any

3. *Admission of the spent cartridge.* The defendant objects to the admission in evidence of a .38 caliber cartridge case which was found on a shelf in his bedroom on October 1, 1986 — four days after the shooting.[10] This evidence was presented in conjunction with the testimony of the Commonwealth's ballistics expert, who stated that the projectile recovered from the victim's body was a .38 caliber projectile, and had been fired from either a .38 caliber or a .357 caliber revolver. The expert also testified that this projectile was "consistent with the type of projectile that could be or was loaded into the discharged cartridge case." An instrument in the possession of a defendant at or about the time of the crime that could have been used in committing the crime is admissible in the judge's discretion. *Commonwealth* v. *Toro,* 395 Mass. 354, 356 (1985).

However, the defendant contends that the judge abused her discretion in admitting the cartridge case because, in these circumstances, its potential for prejudice exceeded its probative value. In particular, the defendant claims he could not possibly have returned to his apartment to deposit the cartridge between the time of the shooting and his arrest the following day, September 29, 1986, at approximately 5 P.M. Furthermore, the defendant argues that, if he had been carrying the spent cartridge on the day of the shooting, it would have been discovered when his person was searched that day by the Brookline police pursuant to his arrest on an unrelated traffic offense warrant. No cartridge was found in that search.

The Commonwealth points out, however, that (1) the defendant could have placed the cartridge in his apartment between the time of his release from the Brookline police sta-

---

inference from the fact that [Mr. Doe] did not appear as a witness." *United States* v. *Martin,* 526 F.2d 485, 486-487 (10th Cir. 1975).

[10]The .38 caliber cartridge case was admitted as part of an exhibit which also included a .357 caliber cartridge case, a 9 millimeter cartridge case, a live .22 caliber round, and a live .357 caliber round. However, the defendant's appeal challenges only the admission of the .38 caliber cartridge case. We thus consider only that one item.

tion during the afternoon of September 29, and his arrest at 5 P.M. that day, and (2) there is no evidence that the Brookline police searched the defendant's car, where the cartridge might have been hidden.

We agree with the Commonwealth that the evidence permits an inference that the defendant could have removed the cartridge from which the fatal shot was fired, hidden it in his car, and later placed it on the shelf in his bedroom prior to his arrest at 5 P.M. on September 29. For this reason, the cartridge had probative value in so far as it tended to prove that the defendant had possession of the murder weapon, or perhaps even the precise cartridge from which the fatal bullet was fired. "[I]t is commonly competent to show the possession by a defendant of an instrument capable of being used in the commission of the crime, without direct proof that that particular instrument was in fact the one used." *Commonwealth* v. *Toro, supra* at 356, quoting *Commonwealth* v. *O'Toole*, 326 Mass. 35, 39 (1950). We conclude that the judge did not abuse her discretion by admitting the cartridge in evidence.

4. *The denial of a required finding on the conspiracy charge.* The defendant argues that the judge should have allowed his motion for a required finding on the indictment which charged him with conspiracy to burn a motor vehicle. That conspiracy involved the defendant and Marotta and concerned a blue Cadillac automobile in the possession of one Joseph Guarrado.

The question in deciding a motion for a required finding of not guilty is whether on the evidence viewed in the light most favorable to the Commonwealth, the jury "might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt." *Commonwealth* v. *Clary*, 388 Mass. 583, 588 (1983), quoting *Commonwealth* v. *Vellucci*, 284 Mass. 443, 445 (1933). A jury may find a crime proved beyond a reasonable doubt even though the inference of guilt from the

facts established is not inescapable or necessary. *Commonwealth* v. *Nelson*, 370 Mass. 192, 201 (1976).

Further, the crime of conspiracy need not be proved by direct evidence of participation or by an admission of participation. *Commonwealth* v. *Nelson, supra* at 200. "A conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object . . . may be satisfactory proof of a conspiracy." *Id.* at 200-201, quoting *Commonwealth* v. *Smith*, 163 Mass. 411, 417-418 (1895). "Circumstances must be shown from which a reasonable inference can be drawn that the defendant participated in the particular conspiracy charged." *Id.* at 201, quoting *Commonwealth* v. *Schnackenberg*, 356 Mass. 65, 74 (1969).

The evidence in this case, viewed in the light most favorable to the Commonwealth, was sufficient to permit a finding of conspiracy between the defendant and Marotta to commit arson. There was evidence presented that Joseph Guarrado, a friend of the defendant, had been trying for months to sell his blue Cadillac automobile, that he asked the defendant for help in getting rid of the automobile and that the defendant said he knew of someone who might be able to help. It was shown that the defendant then called Marotta and arranged for Marotta to drive up to New Hampshire, where the car was located, to pick it up, that the defendant removed the stereo system, hub caps, and other valuable parts from the car, and that the defendant "popped" the car's ignition. There was further evidence that Marianne Karon (Guarrado's girl friend) told a neighbor on the day of the incident that she was sad because her car would be stolen that evening, that the defendant and Marotta drove to New Hampshire together on the day of the incident, and that the defendant and Marotta drove back from New Hampshire separately (Marotta in the Cadillac; the defendant in his own car) to the defendant's home in Revere.

The prosecutor also presented evidence that the defendant and Marotta conferred at that time before leaving in separate cars for the home of Marotta's friend in Roslindale, that on their way to Roslindale, stones were allegedly thrown at one of the cars, that both men parked their automobiles and together proceeded to the scene of the victim's shooting, that after the shooting both men were seen running together from the scene no more than two feet apart. Finally, the prosecutor presented testimony that the blue Cadillac was found burned in South Boston approximately thirty minutes after the shooting, that the fire had been deliberately set, that Karon later that night reported the blue Cadillac stolen, and that the whereabouts of the defendant were unknown from the time of the shooting until early the following morning.

On the basis of this evidence, the jury could properly have concluded that the defendant, Marotta, Guarrado, and Karon agreed to stage a car theft, that, in the course of staging that theft the car was brought to the attention of eyewitnesses to the victim's death, and that the defendant and Marotta, at least, at some point subsequent to the initial agreement agreed to burn the car. That the defendant and Marotta had been involved in a murder approximately thirty minutes before the arson, that they had discussed the car with eyewitnesses to the murder, and that they were seen together with the car driving away from the location of the murder provided a basis for a reasonable inference that the defendant knew of, and agreed to, the arson in an attempt to conceal his involvement in the murder and to inhibit investigation and discovery. "The fact that the evidence did not require the jury to draw [this] inference . . . does not preclude the conclusion we have reached. It is sufficient that the evidence permitted the inference which the jury obviously drew against [the defendant]." *Commonwealth* v. *Nelson, supra* at 203.

5. *Review under G. L. c. 278, § 33E.* We have examined the record to ascertain whether there might be a basis for relief pursuant to the power conferred on this court by G. L. c. 278, § 33E. The murder was a premeditated, senseless kill-

ing of a thirteen year old boy. There is nothing in the record which provides any basis for reduction of the degree of murder or any reason for a new trial.

*Judgments affirmed.*