NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12984

COMMONWEALTH  vs.  JULIAN TROCHE.


Suffolk.     September 15, 2023. - November 16, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Wendlandt, & Georges, JJ.


Homicide.  Armed Assault with Intent to Murder.  Assault and
     Battery by Means of a Dangerous Weapon.  Identification.
     Evidence, Identification, Credibility of witness, Relevancy
     and materiality, Inflammatory evidence, Photograph.
     Witness, Self-incrimination.  Constitutional Law, Self-
     incrimination.  Practice, Criminal, Voir dire, Cross-
     examination by prosecutor, Instructions to jury,
     Stipulation, Argument by prosecutor.



     Indictments found and returned in the Superior Court
Department on June 20, 2017.

     The cases were tried before Mitchell H. Kaplan, J.


     Robert F. Shaw, Jr., for the defendant.
     Kathryn Sherman, Assistant District Attorney (Mark Zanini,
Assistant District Attorney, also present) for the Commonwealth.


     WENDLANDT, J.  The defendant, Julian Troche, was convicted

of murder in the first degree on a theory of deliberate

premeditation in connection with the November 2016 killing of

Dantley Leonard, who was shot eleven times in a "drive-by"[1] shooting in the Dorchester section of Boston. The defendant was also convicted of armed assault with intent to murder and assault and battery by means of a dangerous weapon in connection with the shooting of Antwuan Mair, who was shot during the same incident as Leonard.[2]

Mair described the shooter as a light-skinned man, who had been a front seat passenger in a silver or grey sedan. The defense at trial centered on mistaken identification. No witness was able to identify the defendant as the shooter. Instead, the prosecution chiefly relied on the testimony of one witness, who identified the defendant as the driver of a bluish-silver Nissan sedan that the witness twice had seen a few blocks away from the scene of the crime approximately twenty to thirty minutes before the shooting.

In this direct appeal, the defendant contends that the judge erred in denying his request to conduct a voir dire examination of this key prosecution witness when, following the witness's testimony, defense counsel received an anonymous text

---

[1] A drive-by is defined as "an action carried out from a passing vehicle." Oxford English Dictionary, https://www.oed.com/search/dictionary/?scope=Entries&q=drive-by [https://perma.cc/88KY-TLG4].

[2] The defendant was also convicted of unlawful possession of a firearm.

message suggesting that the witness had falsely identified the defendant as part of a plot to frame him.  The text message was accompanied by screenshots[3] of what purported to be a communication from the witness's social media account; if the screenshots were genuine, as presented by the anonymous sender, the witness appeared to express discomfort with his allegedly false testimony and was buoyed by the unidentified person with whom he was communicating.

The defendant also contends that the prosecutor improperly questioned a witness concerning his invocation of his privilege against self-incrimination pursuant to the Fifth Amendment to the United States Constitution and his understanding of his grant of transactional immunity in front of the jury, that the prosecutor impermissibly questioned lay witnesses about gang activity, that the prosecutor introduced inflammatory photographs of the defendant's friend's dead body from an incident that occurred two months prior to the shooting at issue, that the trial judge erred in instructing the jury consistent with the parties' stipulation that the defendant was first apprehended in connection with an investigation unrelated

---

[3] A screenshot is "[a] photograph or (now usually) a digital image of all or part of what is displayed at a given time on a screen."  Oxford English Dictionary, https://www.oed.com/search/dictionary/?scope=Entries&q=screenshot [https://perma.cc/ACR8-89CH].

to the charged crimes, and that the prosecutor misstated facts in closing argument. The defendant also asks the court to exercise its authority under G. L. c. 278, § 33E, to order a new trial.

Because the judge erred in denying defense counsel's request to conduct a voir dire examination of the key identification witness, we vacate the defendant's convictions and remand for a new trial. We also address the defendant's other claims of error to the extent they may arise in any subsequent retrial.

1. Background. "We recite the facts as the jury could have found them, in the light most favorable to the Commonwealth, reserving certain details for later discussion." Commonwealth v. Niemic, 483 Mass. 571, 573 (2019).

a. Commonwealth's case. i. November 2016 shooting. On the afternoon of November 12, 2016, Leonard and Mair were on Ames Street in Dorchester, near the Franklin Field housing development. Their childhood friend, who was helping his girlfriend move furniture into an apartment, had asked Leonard to move his vehicle to allow the friend to park a moving truck. Mair was assisting with the move and stood behind the truck to direct it into the parking spot. Another longtime friend of Leonard, Mair, and the truck's driver had accompanied Leonard outside and also stood in the vicinity of the truck, though

further away from the street.  As the truck backed into the parking spot, a silver car approached the group of friends.  The time was approximately 4:45 P.M.  A light-skinned man opened the car's front passenger door and fired shots from a firearm in the direction of Leonard and Mair.  Leonard was shot eleven times, and Mair was shot three times.  Mair survived the shooting but suffered two wounds in his arm and one in his back; Leonard died from his wounds within minutes.

Ballistics analysis following the shooting determined that the bullets that killed Leonard and injured Mair, as well as a spent bullet, a bullet fragment, and several casings at the crime scene, had all been ejected from a single .40 caliber Smith and Wesson firearm.  As discussed infra, this same weapon had been one of the weapons used two months earlier during an exchange of gunfire involving the defendant.  At that incident, the defendant had been injured and his longtime friend had been killed.

None of those present at the November 2016 crime scene identified the defendant as the shooter.  Instead, Mair generally described the car from which the shooter opened fire as silver, the shooter as light-skinned, and the driver as dark-

skinned.  The two other witnesses present at the shooting did not see the shooter or the vehicle.[4]

In addition, a woman who had heard gunshots peered from her second-floor apartment on Ames Way and saw a dark-skinned man with braids, presumably Leonard, on the ground and bleeding. She also saw a gray sedan fleeing the scene.  The woman later identified the car she had seen fleeing the scene as having a similar body type and color as the Nissan Altima sedan driven by the defendant.  However, she too did not identify or provide a description of the shooter.

Approximately twenty to thirty minutes before the shooting, Yordany Rodriguez and a companion were on the corner of Ames Street and Westview Street, a few blocks from where the shooting took place; they were cleaning the companion's stepfather's vehicle.  A silver sedan[5] approached a stop sign on the opposite side of the street from where Rodriguez and his companion were working.  The silver sedan's driver, a light-skinned man with a goatee and a short haircut and wearing a gray hooded sweatshirt,

---

[4] The prosecutor also elicited testimony about gang activity in and around Franklin Field from these two witnesses.  One testified that each of the four men had been part of a Franklin Field gang during their youth, but the other witness responded that he knew nothing about gangs in the area.

[5] Rodriguez described the color of this vehicle as "two-toned" with "silver throwing to like baby blue."  His companion described it as "silver or gray."

and the passenger, a dark-skinned man with a hooded sweatshirt pulled close to his face, gave Rodriguez and his companion a look, as if they were "trying to see if they recognized somebody."  The driver asked Rodriguez and his companion "what the f*ck [they] was looking at" and "if [they] were from there."  To the latter question, Rodriguez replied "no."[6]

Rodriguez testified that the passenger appeared surprised when he apparently noticed a security camera on a nearby utility pole.  The passenger "laid back" in his seat, and the sedan left.  A few minutes later, the sedan returned and the driver and passenger "mean-mugged"[7] the two men.

Concerned because of these two encounters,[8] Rodriguez and his companion gathered their cleaning supplies and went inside a nearby building where the companion lived.  Anywhere from ten to

---

[6] Another witness, Phillipe Woods, Sr. (Woods Senior), testified that residents of Franklin Field and the nearby neighborhood of Franklin Hill generally and at unspecified times experienced "disagreements" that resulted in violence, including "[s]hootings, stabbings."

[7] "Mean-mugging" is "the act of glowering at someone with an intimidating, irritated, or judgmental facial expression." Dictionary.com, https://www.dictionary.com/e/slang/mean-mugging/ [https://perma.cc/S2KC-JJ8J].  Rodriguez testified about being "mean-mugged" during his grand jury testimony, but at trial he denied making this statement.

[8] At trial Rodriguez testified, "That sh*t . . . always happens around that neighborhood.  That happened to us.  That's the only thing that needs to happen to us for us to be, like, all right, we gotta get outta here."

thirty minutes later, Rodriguez and his companion heard gunshots.

At 4:31 P.M., a surveillance video camera at the intersection of Blue Hill Avenue and Westview Street captured a car generally matching the appearance of the one identified by Rodriguez and his companion turn left from Westview Street onto Stratton Street.[9]  The video shows a similar vehicle driving on Westview Street at 4:35 P.M. and slowing near the Stratton intersection before turning right onto Blue Hill Avenue.[10]  The video resolution was insufficient to show the car's license plates or to identify its occupants.

Rodriguez spoke to police officers on the night of the shooting but did not report the car he had seen earlier; he explained that he thought that his prior encounter was unrelated to the shooting.  Six months after the shooting, Rodriguez was called to testify before a grand jury.[11]  Before giving his

---

[9] By turning onto Stratton Street, the car headed back towards the Franklin Field development where the shooting occurred.

[10] By taking a right on Blue Hill Avenue, the car was heading away from the eventual crime scene.  The prosecutor contended that the defendant did this to loop around and avoid the surveillance camera at the Ames Street and Westview Street intersection.

[11] Rodriguez testified that he had no intention of sharing his information or testifying until police approached him about testifying in front of the grand jury.

testimony, he was shown a photographic array of eight men, and Rodriguez selected the defendant's photograph, identifying the defendant as the driver of the silver sedan Rodriguez had seen prior to the shooting. At trial, Rodriguez confirmed this identification and identified the defendant in court. Rodriguez was the only witness who identified the defendant as being near the scene of the shooting, albeit twenty to thirty minutes prior thereto when the defendant was the driver, not the passenger, of the silver sedan.

ii. Nightclub shooting. At trial, the Commonwealth's theory was that the defendant had shot Leonard and Mair in retaliation for the killing of his longtime friend, Phillip Woods, Jr. (Woods Junior), approximately two months before the November shooting. Specifically, on September 17, 2016, at about 2:25 A.M., the defendant, along with Woods Junior and another friend, Corey Jacques, were outside a nightclub in Dorchester when an exchange of gun fire transpired. Woods Junior was killed, and the defendant and Jacques were injured.

Ballistics analysis following the shooting determined that one of the weapons used in the shootout was a nine millimeter Luger; inferably, this was the weapon used to kill Woods Junior and to injure the defendant and Jacques. Based on ballistics analysis of shell casings found near Woods Junior's body, the other weapon was a .40 caliber Smith and Wesson, eventually

determined to be the same weapon that had been used to shoot Leonard and Mair two months later.

At trial, the defendant called a witness who, minutes after the nightclub shooting, encountered the defendant while walking to his parked car behind the nightclub.  The witness testified that the defendant, bleeding and "kinda hysterical," asked the witness to drive him to the hospital.  The witness, who saw no one else nearby, agreed.  An officer, whom the defendant also called at trial, spotted the witness's car speeding and pulled him over for a routine traffic stop.  The witness reported that he was taking the defendant to the hospital because the defendant had been shot.  At trial, the officer testified that, because he was aware that a shootout had occurred near the nightclub moments earlier, he searched the witness, the defendant, and the witness's vehicle for firearms.  Finding none,[12] the officer called for an ambulance to take the defendant to the hospital.

iii.  Defendant's activities following the nightclub shooting.  Two days after the nightclub shooting, Phillipe Woods, Sr. (Woods Senior) -- Woods Junior's father -- sent a text message to the defendant; the message, which contained no

---

[12] The .40 caliber firearm used at the September and November shootings was not found either at the Ames Street crime scene or on the defendant's person after the September nightclub shooting.

words, consisted of a photograph depicting the upper body of a broad-shouldered Black man with shoulder-length braids. The photographed man somewhat resembled Leonard insofar as the two had similar skin tones, braided shoulder-length hair, and large builds; they were otherwise distinguishable.[13]

Approximately one week after the nightclub shooting, the defendant engaged in the following text message exchange with an unidentified person:

Anonymous: "I wish I was home so f*cking bad!"

Defendant: "Don't even sweat it I'm here just gotta get back mobile"

Anonymous: "But all this teaching me a hard lesson[.] I should've did so much more out there, set the tone for what actions like this would bring"

Defendant: "Like I said don't sweat it trust me"

Anonymous: "I got all the faith in world in you my dude, I know your work but a extra hand lightens up the load"

Defendant: "This run going be a pleasure it ain't just for the sport no more"

Anonymous: "And I respect that! Your pleasure is the pleasure of everyone who feels this loss"

Defendant: "Real sh*t"

---

[13] The Commonwealth theorized that the defendant shot Leonard wrongly believing him to be the person photographed who, the Commonwealth contended, was identified as the shooter of Woods Junior. At trial, Woods Senior testified pursuant to a grant of immunity. He stated that he did not remember sending the photograph and that he did not know the man it depicted. At trial, the Commonwealth argued that Leonard was not Woods Junior's actual killer.

Anonymous:  "I would say leave some for me but f*ck them suckas any way you can"[14]

iv.  <u>The defendant's activities prior to the November 2016 shooting</u>.  At about 12:30 <u>A.M.</u> on the day Leonard was killed, the defendant received a text message from Hassaun Daily, who was a longtime friend of Woods Junior, the victim of the nightclub shooting.  Daily stated, "let's get up tomorrow."

At about noon that same day, cell site location information (CSLI)[15] showed the defendant's cellular telephone near his own apartment in the Fenway neighborhood of Boston.  At 3:57 <u>P.M.</u>, the defendant called Daily, after which Daily sent a text message to the defendant that included an address in the Mattapan neighborhood of Boston.

At 4:15 <u>P.M.</u>, the defendant placed a six-second telephone call to Daily; CSLI showed that the defendant's cellular

---

[14] At trial, the Commonwealth argued that this exchange showed that the defendant was planning to retaliate for Woods Junior's killing.

[15] CSLI does not provide the precise location of a given cellular telephone.  Instead, it shows that a device is within a cell tower's coverage area when that device uses the tower to send a text or make a call; the smaller the coverage area, the more precise the location information becomes.  See <u>Commonwealth</u> v. <u>Augustine</u>, 467 Mass. 230, 237 (2014), <u>S.C.</u>, 470 Mass. 837 and 472 Mass. 448 (2015) ("A cellular service provider has a network of base stations, also referred to as cell sites or cell towers, that essentially divides the provider's service area into 'sectors.' . . . Cell site antennae send and receive signals from subscribers' cellular telephones that are operating within a particular sector.").

telephone was near the address sent by Daily and Daily's cellular telephone. CSLI also showed that Daily's cellular telephone was near the crime scene at 4:30 P.M. The shooting on Ames Street occurred at 4:45 P.M.

v. The defendant's activities following the November 2016 shooting. No CSLI data were available from the defendant's cellular telephone from 4:15 P.M., when he placed a call to Daily from a location near Daily's home address, until 4:48 P.M., three minutes after the shooting.[16] At that latter time, CSLI data showed that the defendant's cellular telephone was near a tower one mile south of the crime scene, near the Morton Street train station. At 4:51 P.M., the defendant's cellular telephone used a tower less than a mile east of the tower used at 4:48 P.M. No CSLI data were presented concerning the location of Daily's cellular telephone from 4:30 P.M., when he was near the scene of Leonard's killing, to 4:57 P.M., when Daily's cellular telephone used the same tower that the defendant's cellular telephone had accessed six minutes earlier.

Around 5:30 P.M., approximately forty-five minutes after the shooting, the defendant engaged in a brief, six-second

---

[16] At trial, the Commonwealth argued that the defendant was travelling with Daily, and that Daily was the dark-skinned occupant of the silver sedan described by several witnesses, including Rodriguez. The Commonwealth entered a photograph of Daily in evidence but elicited no testimony identifying Daily as the driver.

telephone call with Daily, followed by a one-minute call with Woods Senior.  The defendant had several brief calls with Daily and Woods Senior between 8:20 P.M. and 8:55 P.M.  From 9:12 P.M. to 9:52 P.M., the defendant and Woods Senior engaged in the following text message exchange:

Woods Senior:  "You good"

Defendant:  "Yes sah"

Woods Senior:  "Is whooo kid good"[17]

Defendant:  "Yeah he with me"

Woods Senior:  "Figure it out and be careful please"

Defendant:  "U already"

Woods Senior:  "Lol to hood."[18]

vi.  The defendant's arrest.  On November 14, 2016, two days after Leonard's and Mair's shooting, a Boston police officer arrested the defendant outside his apartment in connection with a different matter.[19]  At the time of his arrest,

---

[17] Daily's nickname was "Hu."

[18] At trial, Woods Senior testified that "Lol to hood" meant "Laugh out loud" to the "Dorchester area," specifically "Blue Hill."  The prosecutor argued that Woods Senior had actually meant Franklin Hill as the "hood."

[19] The parties stipulated that the defendant was arrested for a matter not concerning the case at hand.  The judge gave the following instruction to the jury:

"So the testimony you just heard about [the defendant] being arrested on November 16, the parties stipulate that that arrest had to do with an investigation that was

the defendant was wearing a black sweatshirt and driving a blue-gray Nissan Altima sedan. In the vehicle was a black, wool and leather jacket bearing a pin with a photograph of Woods Junior and the words "Forever in Our Hearts Phillip Woods Jr." Subsequent forensics testing of the sweatshirt showed a positive result for gunshot primer residue; the jacket did not.[20] The sedan was not tested.

b. Defense at trial. The defense at trial centered on misidentification. As discussed supra, in the Commonwealth's case-in-chief, one witness who lived near the scene of the shooting testified that she had observed a gray sedan fleeing the crime scene. By contrast, the woman's daughter testified in the defendant's case that, from a different room in the same

---

unrelated to anything having to do with this case. And obviously you shouldn't draw any adverse inference against [the defendant] because he was the subject of investigation that was not related to this case."

[20] It was the Commonwealth's theory that the defendant was wearing the same black sweatshirt on the day of the shooting. Rodriguez, however, had testified before the grand jury that the driver of the gray sedan, whom he identified as the defendant, was wearing a "gray hoodie sweatshirt."

A forensic scientist explained at trial that, pursuant to the laboratory's policy, three particles of gunshot residue on a tested item were required to register as a positive. The sweatshirt had three such particles, but the jacket only had one. The forensic scientist further testified that gunshot residue particles are transferable such that a police officer might transfer one onto a defendant when taking him or her into custody.

apartment, she saw two Black men wearing gray hooded sweatshirts shooting toward a gate in front of her building. She saw one of the men fall, while the other man continued to shoot before taking his fallen companion's gun and leaving the scene. She also testified that she saw no car in the vicinity of the shooting.[21]

Another witness who also lived on Ames Street heard gunshots and looked out her front door. She also saw two men; they were running and yelling "Dub is down, Dub is down."[22] As they were running by, she noticed a dark blue or black vehicle stop in the road before speeding off quickly.

c. Procedural history. On June 20, 2017, the defendant was indicted for murder in the first degree for the killing of Leonard, G. L. c. 265, § 1; armed assault with intent to murder, G. L. c. 265, § 18 (b), and assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A, in connection with Mair; and unlawful possession of a firearm, G. L. c. 269, § 10 (a).[23]

---

[21] In his closing argument, the prosecutor argued that the witness's testimony regarding seeing two shooters was contradicted by the ballistics evidence that casings from only one firearm were found at the scene. There was, however, evidence that certain firearms do not emit casings.

[22] There was testimony that "3-Dub" was Leonard's nickname.

[23] The trial took place before our decision in Commonwealth v. Guardado, 491 Mass. 666, 690 (2023), in which we held that "the absence of a license is an essential element of the offense of unlawful possession of a firearm pursuant to G. L. c. 269,

Following a jury trial in August 2019, the defendant was found guilty on all counts. As to the charge of murder in the first degree, the jury found the defendant guilty on the theory of deliberate premeditation. The defendant filed a timely notice of appeal.

2. <u>Discussion</u>. a. <u>Voir dire</u>. The defendant first maintains that the judge abused his discretion in denying defense counsel's request to conduct a voir dire examination of Rodriguez when, following the completion of Rodriguez's testimony, defense counsel received an anonymous text message and accompanying screenshots of a social media account, which purported to show that Rodriguez falsified his identification testimony. More particularly, defense counsel received a series of text messages from an anonymous sender who claimed to be Rodriguez's cousin. The first text message stated: "This is annoyoms [sic] person I have your card I am one of the witness family I think it's so wrong how they are setting up your client[.] [M]y cousin and his friends are lying on this poor guy I found this in his phone the other day." The accompanying text messages were screenshots of the following conversation

_____

§ 10 (a)." Here, the judge did not instruct the jury on this element. At any new trial, the Commonwealth must prove this element. Id.

with a Facebook social media account bearing the name "Yordany Rodriguez":[24]

Anonymous:  "What's good bro

"Heard you went to court did you say what we told you to say to set that n**** up"

Rodriguez:  "Yeah bro I went up sh*t was wild

"Nervous as f*ck

"Bro I think it's wrong that we lying that n****"

Anonymous:  "Man f*ck that n****

"He's all set

"We can't say to [sic] much on this sh*t cause the feds be watching you heard"

Rodriguez:  "Snm bro we talk in person soon"

Anonymous:  "Ight bet"

Defense counsel notified the judge and the prosecutor of the messages.  On the next trial day, the judge held a sidebar. Defense counsel reported that, although he had sent a text message to the telephone number noted in the message he had received asking the sender to meet him that morning, no one had appeared.  The prosecutor stated that he had asked the investigating officers on the prosecution team to call the cellular telephone number, but they received no response.  The

---

[24] The screenshots also show that the social media account includes a small profile photograph of a bearded man with a child.  Under the photograph, the name "Yordany Rodriguez" is shown, as well as the phrase "You're friends on Facebook."

officers had been unable to determine the identity of the anonymous sender; the prosecutor explained that the text messages were sent through voice over Internet protocol (VoIP), an application that allowed the user to send the text messages from a randomly generated number, making it difficult to identify their source.[25]  The prosecutor also reported that officers had been unable to access the social media account or to confirm its authenticity.  The officers had told the prosecutor that they had found "many Yordany Rodriguezes on Facebook."

The judge stated, "[I]t would seem to me that the police ought to pay a visit to Mr. Rodriguez, I suspect as nice a visit as possible, and ask if he would allow them to look at his [social media] page."[26]  The judge added, "[I]t seems to me, on

---

[25] The prosecutor noted that "the app[lication] assigns that particular phone a phone number . . . which is essentially anonymous without . . . serving legal process of some company."

[26] The judge later expanded on his comments:

"The question is whether or not first that comes from the Yordany Rodriguez Facebook account that is actually involved in this case, and secondly, that those postings on Facebook were not postings that could be made by anybody associated with the public . . . .  But we need to investigate it to see if that is so."[27] The prosecutor reported that he had asked a detective to get in touch with Rodriguez, and the detective called Rodriguez's telephone number during lunch.  Ten or so minutes later, the detective's telephone received a call, indicating that it was from Rodriguez; the detective was out of the room.  The prosecutor answered the telephone and spoke with Rodriguez

the face of this, one would think that this is a blatant attempt to obstruct justice." He also said that he did not "intend to slow down the trial at this point." The prosecutor noted that Rodriguez was a hostile witness who would be hostile to any further interaction with the prosecution team, but the judge responded that "there's no point in our speculating as to what Mr. Rodriguez's response will be." The judge also noted that Rodriguez's trial testimony was consistent with his grand jury testimony and his photographic array identification of the defendant, although he "didn't see anything that suggested that . . . this was anything other than Mr. Rodriguez being pulled here against his will to provide his testimony." At the end of this sidebar, the judge said, "[W]e're going to now stop speculating on the record. [The prosecutor] has indicated that he will have somebody interview Mr. Rodriguez. And then when we have the results of that interview we will come back."

After the jury recessed for the day, defense counsel requested to recall Rodriguez as part of the defendant's case-in-chief to inquire about the anonymous message and social media screen shots. The judge denied the request, reasoning that "if you had that when he was first being questioned, without more I wouldn't let you inquire with respect to that." For his part,

_____

for ten to fifteen minutes, during which Rodriguez denied the Facebook communications.

the prosecutor reported that, during the lunch break, he had spoken with Rodriguez, who "adamantly denied ever having any communication of this sort about this case."[27]

The next morning, the judge asked the prosecutor to describe again his conversation with Rodriguez.  The prosecutor stated that Rodriguez had denied having the conversation shown in the screenshots, denied that someone else might have had access to his cellular telephone, and stated that he did not know who had sent the anonymous text to defense counsel; Rodriguez also mentioned that he had received some messages on his social media account "to the effect that people in jail have labeled him a snitch, a rat."

Defense counsel asked to conduct a voir dire examination of Rodriguez concerning the messages.  Denying this request, the judge explained, "I tried to determine whether there was some basis on which I'd have to close the court room to do the voir dire and conclude it, and I couldn't come up with a theory on which I could close the court room to do the voir dire."  He also said that "bringing [Rodriguez] into Court to say

---

[27] The prosecutor reported that he had asked a detective to get in touch with Rodriguez, and the detective called Rodriguez's telephone number during lunch.  Ten or so minutes later, the detective's telephone received a call, indicating that it was from Rodriguez; the detective was out of the room. The prosecutor answered the telephone and spoke with Rodriguez for ten to fifteen minutes, during which Rodriguez denied the Facebook communications.

essentially the same thing that he said to [the prosecutor] with detectives over the telephone, albeit under oath . . . did not seem to me a useful thing to do, and fraught with additional obvious dangers, and so I've concluded not to do that."  The judge further reasoned that he would not allow defense counsel to cross-examine Rodriguez regarding the screenshots of the social media account absent "materials from [the social media company], which would take a very long time to acquire, as [the social media company] tends not to turn this over until they have been served with process and required to do that by a Court order."  The judge had previously told defense counsel that, should an investigation later show the authenticity of the social media account as belonging to Rodriguez and of the screen shots thereof, it might form the basis of a motion for postconviction discovery.   The judge noted the defendant's objection to his decision.

   i.  Standard of review.  "The decision to conduct a voir dire examination of a witness rests in the sound discretion of the trial judge . . . ."  Commonwealth v. Pina, 481 Mass. 413, 431 (2019), citing Commonwealth v. Rodriguez, 425 Mass. 361, 370 n.5 (1997).  The judge's decision "will not be disturbed unless it constitutes 'a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives.'"  Pina,

supra, quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

ii. Analysis. To be sure, there was reason to doubt the authenticity of this new information, and not every stray anonymous comment can form the basis for a voir dire. The information in this case was sent by an anonymous sender, who did not respond to defense counsel's request for a meeting, and the telephone number associated with the message had not been identified as belonging to a particular individual because of the use of the VoIP technology -- an apparent attempt to shield the sender's identity. Moreover, Rodriguez arguably had been a reluctant witness; he testified that he had no intention of sharing his information with police until they found him and that he did not want to take time to testify -- conduct that arguably was inconsistent with someone involved in a plot to frame the defendant.

Still, the information was troubling, suggesting that the Commonwealth's key identification witness was fabricating his testimony; indeed, the judge recognized the need to investigate the allegations. Contrast Commonwealth v. McLeod, 394 Mass. 727, 740, cert. denied, 474 U.S. 919 (1985) (no abuse of discretion to deny request to conduct voir dire of witness whose change in testimony was not relevant to crimes at hand). For this reason, the judge concluded that further investigation was

warranted in view of the potential effect of the new information, if shown to be from Rodriguez's social media account. Relying on a brief investigation, involving a ten- to fifteen-minute telephone conversation between the prosecutor and Rodriguez, however, the judge denied defense counsel's request to conduct a voir dire examination. He based the denial on several grounds, which we examine in turn.

The judge believed that he could not conduct a voir dire without basis to close the court room. The judge did not explain why closure might be necessary in this situation, and we fail to identify any such reason in the record. The purpose of the voir dire would have been to examine Rodriguez about the new information and determine whether it was authentic. Nothing about the proposed voir dire would have required, or justified, the court room to be closed. See Commonwealth v. Cohen (No. 1), 456 Mass. 94, 107 (2010) ("courts recognize a strong presumption in favor of a public trial overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest" [quotations and citations omitted]).

The judge also concluded that a voir dire would be a waste of judicial resource because, the judge believed, Rodriguez would say nothing different in court under oath from what he had reported to the prosecutor when questioned telephonically. But

"ensuring that a witness will give his statements under oath . . . impresses upon him the seriousness of the proceedings and importance that he testify truthfully."  Commonwealth v. Bergstrom, 402 Mass. 534, 543 (1988).  Moreover, a voir dire examination would have provided the ability to observe Rodriguez's demeanor while testifying.  Id. at 547 ("Evaluating a witness's credibility is one of the most difficult tasks facing a trier of fact.  Personal observation of a witness aids immeasurably this process" [citation omitted]).  The information provided to defense counsel by the anonymous sender raised significant questions regarding the truthfulness of Rodriguez's identification testimony, which was a key element of the Commonwealth's case; in short, the new information directly called into question the integrity of the trial itself.  Under the circumstances, allowing a voir dire examination of Rodriguez, during which he would be under oath, was critical.

Further, the judge reasoned that defense counsel would not be able to question Rodriguez regarding the screenshots without first obtaining a subpoena for the social media company to authenticate the new information.  Specifically, the judge stated that defense counsel "would have no means of cross examining [Rodriguez] without materials from [the social media company]," presumably because the materials otherwise could not be authenticated.  "Evidence that . . . [an] electronic

communication originates from . . . a social networking Web site . . . that bears the [witness's] name is not sufficient alone to authenticate the electronic communication as having been authored or sent by the [witness]." Commonwealth v. Purdy, 459 Mass. 442, 450 (2011). Instead, "[t]here must be some 'confirming circumstances' sufficient for a reasonable jury to find by a preponderance of the evidence that the [witness] authored the [electronic communication]" (citation omitted). Id. A voir dire examination of Rodriguez might have elicited the requisite confirming circumstances or alternatively might have confirmed the messages' lack of authenticity.[28]

Significantly, the inadmissibility of the social media messages without authentication formed the basis for the judge's denial of the defendant's request to question Rodriguez in the defendant's case in chief. See Purdy, 459 Mass. at 447 & n.5 ("because the relevance and admissibility of the communications

---

[28] These confirming circumstances include, inter alia, acknowledgement by the witness that the account is his; the messages being found on a computer or hard drive owned by the witness; third-party testimony indicating the witness sent the messages; and the messages containing details about the witness's personal life. See Commonwealth v. Welch, 487 Mass. 425, 441 (2021); Purdy, 459 Mass. at 450-451. Authentication may benefit from but does not require testimony that others could not access the witness's account. See Purdy, supra at 451 & n.7; Commonwealth v. Williams, 456 Mass. 857, 868-869 (2010). Here, the prosecutor reported that Rodriguez had told him that no one else had access to his cellular telephone and that his telephone was not even working.

depended on their being authored by the defendant, the judge was required to determine" authenticity). Far from providing a basis to deny the defendant's request to conduct a voir dire examination, the judge's reasoning highlights the need for a voir dire. In particular, because he was deprived of the opportunity to try to authenticate the social media conversation through a voir dire of Rodriguez, the defendant was further deprived of the opportunity to marshal his defense by calling into question Rodriguez's credibility. Cf. Pina, 481 Mass. at 431-433 (no abuse of discretion to deny request to conduct voir dire of witness concerning source of witness's knowledge of defendant's nickname where witness testified he had learned of nickname from "someone" prior to identification procedure and defendant had opportunity but "chose not to pursue the issue on cross-examination"); McLeod, 394 Mass. at 740-741 (no abuse of discretion to deny request to conduct voir dire of one witness whose change in testimony was not relevant to any material aspects of her testimony and of second witness who was cross-examined at length about change in his testimony).

In addition, the judge had previously reasoned that a voir dire examination was unnecessary because, if the defendant were convicted, he could seek to authenticate the materials thereafter and bring motions for postconviction discovery and a new trial once he was able to do so. But allowing a voir dire

of Rodriguez might have elicited information authenticating the new information, which could have been used by the defendant to undermine Rodriguez's credibility.  Given that Rodriguez was the only witness to place the defendant near the scene of the crime, calling into question Rodriguez's credibility might have planted sufficient doubt in jurors' minds such that a conviction might have been avoided in the first place.

Finally, we reject the Commonwealth's contention that Rodriguez's hostility as a witness put to rest all questions regarding the authenticity of the social media information.  Arguably, as the Commonwealth asserts, Rodriguez's reticence to testify was inconsistent with the suggestion in the social media information that he had plotted to frame the defendant.  On the other hand, Rodriguez's reticence arguably was consistent with the social media information, reflecting his doubts about the correctness of his participation in the alleged plot.  A voir dire examination of Rodriguez could have provided information to resolve these questions and thus was critical to determining Rodriguez's credibility.

In view of the foregoing, we conclude that the judge erred in "weighing the factors relevant to the decision."  L.L., 470 Mass. at 185 n.27.

iii.  Prejudice.  Because the defendant objected to the judge's decision not to allow a voir dire examination of

Rodriguez, we review for prejudicial error. Commonwealth v. Durand, 475 Mass. 657, 670 (2016), cert. denied, 583 U.S. 896 (2017). "[W]e do not determine whether there was prejudicial error by examining what a reasonable jury might have done if the errors had never happened. Instead, we determine whether there is a 'reasonable possibility that the error[s] might have contributed to the jury's verdict.'" Commonwealth v. Crayton, 470 Mass. 228, 253 (2014), quoting Commonwealth v. Alphas, 430 Mass. 8, 23 (1999). See Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994) ("if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," then error is prejudicial [citation omitted]).

We recognize the question to be a close one. There was powerful circumstantial evidence that the defendant was the person in the silver sedan who was with Daily at the time and in the vicinity of the shooting. Nevertheless, Rodriguez's identification testimony was critical to the Commonwealth's case. Rodriguez was the only witness who had identified the defendant as being near the scene of the shooting, approximately twenty minutes prior thereto; according to Rodriguez, the defendant was the driver in a silver sedan circling the neighborhood, which vehicle matched the description of the

vehicle identified as fleeing the scene of the killing.  The text message and screenshots, which were sent to defense counsel after Rodriguez's testimony was complete, suggested that he had falsely identified the defendant in connection with a scheme to frame him.  We cannot exclude a "reasonable possibility" that depriving the defendant of an opportunity to conduct a voir dire examination of Rodriguez and put to rest questions regarding the social media information "might have contributed to the jury's verdict," and the defendant was prejudiced thereby.  Crayton, 470 Mass. at 253, quoting Alphas, 430 Mass. at 23.  Accordingly, we vacate the convictions and remand for a new trial.

We review the defendant's additional claims of error to provide guidance to the extent that they may resurface at any new trial.

b.  Questioning Woods Senior's immunity.  Woods Senior appeared on the first day of trial in response to a subpoena, along with counsel; he invoked his Fifth Amendment privilege against self-incrimination.  On the seventh trial day, before Woods Senior was called in the Commonwealth's case-in-chief, he was granted transactional immunity,[29] which the judge explained

---

[29] Transactional immunity provides a witness protection from prosecution for the crime about which the witness testifies. See Attorney Gen. v. Colleton, 387 Mass. 790, 797 (1982).

"immunized [him] from any possible prosecution as a result of anything [he] might testify to in the course of this trial."

i.  Questions directed at assertion of privilege.  The defendant contends that the prosecutor's questions regarding Woods Senior's invocation of the privilege were improper. Specifically, when Woods Senior was asked about his text messages with the defendant, Woods Senior provided answers, some of which were inconsistent with the documentary record.  For example, he testified that he began communicating more frequently with the defendant "two weeks to a month" after Woods Junior's shooting; but there was evidence that he had sent the defendant a text message two days after his son's shooting. When confronted with the text message, in which he sent a photograph of a man who somewhat resembled Leonard, Woods Senior testified that he could not recall sending the photograph and that he did not know the man photographed.

Similarly, Woods Senior testified that he could not recall the conversations with the defendant following Leonard's killing, testifying that the calls were "just to see how the [defendant was] doing."  He denied having learned about the shooting from those telephone calls.  The prosecutor then asked Woods Senior about his appearance on the first day of trial, and whether he had appeared at that time with counsel to give

testimony; not surprisingly Woods Senior responded that he had "pled the Fifth."

A witness's invocation of the privilege against self-incrimination has little to no probative value and may have a disproportionate impact on the jury. "[W]hen a witness actually invokes the Fifth Amendment in front of the jury, the jury's immediate (and inaccurate) assessment of what that means is more difficult to dispel -- the jury have heard the witness state that the answer would tend to incriminate him, and a juror would not think it was inappropriate speculation to interpret that as a substantive admission of wrongdoing." Commonwealth v. Rosario, 444 Mass. 550, 559 (2005). Generally, it is improper. See Commonwealth v. Gagnon, 408 Mass. 185, 196 & n.5 (1990), S.C., 430 Mass. 348 (1999), and cases cited (improper to call witness "for the sole purpose of invoking his or her privilege against self-incrimination"); Commonwealth v. Hesketh, 386 Mass. 153, 157 (1982), and cases cited.

Here, the prosecutor improperly elicited the witness's testimony regarding his invocation of the privilege against self-incrimination apparently to impeach his credibility after he testified that he could not recall certain communications with the defendant. We have repeatedly recognized that there are a myriad of reasons why a person might invoke the privilege unrelated to the crimes with which a defendant has been charged

or unrelated to any criminal conduct at all.  See, e.g., <u>Gagnon</u>, 408 Mass. at 196.  Given the communications between Woods Senior and the defendant in the wake of Woods Junior's killing, the prosecutor's questions seeking to highlight Woods Senior's invocation of the privilege were particularly improper, with the potential to taint the defendant.

ii.  <u>Questions regarding immunity</u>.  The defendant further contends that the prosecutor's questions to Woods Senior concerning the grant of immunity were in violation of the attorney-client privilege.  We disagree.  A witness who has received immunity may be questioned about the immunity for impeachment purposes.  See <u>Commonwealth</u> v. <u>Michel</u>, 367 Mass. 454, 459 (1975), <u>S</u>.<u>C</u>., 381 Mass. 447 (1980), citing <u>Commonwealth</u> v. <u>Bosworth</u>, 22 Pick. 397, 400 (1839) ("Within the scope of . . . cross-examination it is proper to inquire whether the witness expects more favorable treatment from the government in return for his testimony").  Attorney-client privilege "should present no obstacle to inquiry into" immunity because the privilege only protects confidential information, which excludes information known by third parties.  <u>Michel</u>, <u>supra</u> at 460.  In particular, "the details of what the prosecutor told counsel or the witness, or what counsel conveyed from the prosecutor to the witness, are subject to examination without violating attorney-client privilege."  <u>Commonwealth</u> v. <u>Birks</u>, 435 Mass. 782, 788

(2002), <u>S</u>.<u>C</u>., 462 Mass. 1013 (2012), 484 Mass. 1014 (2020), and 490 Mass. 1018 (2022).

Contrary to the Commonwealth's position, however, the judge was well within his discretion to intervene and halt the prosecutor's numerous and repeated questions about Woods Senior's understanding of the immunity agreement, which could have led Woods Senior to divulge privileged communications regarding, for example, "whether to accept the terms offered by the prosecutor." <u>Birks</u>, 435 Mass. at 788.[30]

c. <u>Gang-related testimony</u>. The defendant asserts that the prosecutor's questions posed to several witnesses regarding gang-related activity, some of which was several years old, were improper absent some nexus between the crime and that activity.[31] We agree.

---

[30] In any retrial, the judge should instruct the jury that immunized testimony cannot serve as the sole basis for a conviction, see G. L. c. 233, § 20I, and ensure that the jury "in assessing an immunized witness's testimony . . . take into consideration whether the witness had been promised some benefit that may have induced the testimony." <u>Commonwealth</u> v. <u>Webb</u>, 468 Mass. 26, 35 (2014).

[31] One of the Commonwealth's theories was that the defendant had, in part, retaliated against Leonard ostensibly because of a purportedly long-running feud between the Franklin Field and Franklin Hill housing projects. The defendant and Woods Junior had grown up in Franklin Hill, while Leonard and his friends present at the shooting had grown up in Franklin Field. The shooting happened outside the Franklin Field housing project.

The prosecutor asked two of Leonard's friends about gangs in and around Franklin Field. One witness testified that he had

"We have recognized repeatedly that evidence of a defendant's gang membership risks prejudice to the defendant in that it may suggest a propensity to criminality or violence." Commonwealth v. Phim, 462 Mass. 470, 477 (2012). "Although the prosecution may not introduce [this] so-called prior bad act evidence to illustrate a defendant's bad character, such evidence may be admissible if relevant for a nonpropensity purpose." Commonwealth v. Chalue, 486 Mass. 847, 866 (2021). Gang evidence therefore can be introduced to show a defendant's motive, see Commonwealth v. Leng, 463 Mass. 779, 783 (2012), but "it will not be admitted if the judge determines that its probative value is outweighed by risk of unfair prejudice to the defendant, taking into account the effectiveness of any limiting instruction." Chalue, supra. As the Commonwealth admits, there

_____

no information regarding gangs, to which the prosecutor responded, "And would you tell us, sir, if you did know these things?" The prosecutor also asked a second witness present at the shooting whether he knew about gangs growing up. That witness explained that the gang in Franklin Field went by different names. He also said that Leonard and the three men at the shooting (including himself) were each at some point affiliated with this gang. On the prosecutor's prompting, the witness testified that the Franklin Field gang had conflict with groups outside of Franklin Field, including Franklin Hill. The prosecutor also asked Woods Senior about the relationship between Franklin Hill and Franklin Field. Woods Senior responded that the two sides had disagreements involving "shootings, stabbings." The prosecutor then asked whether Woods Senior's text to the defendant on the night of the shooting -- saying "LOL to hood" -- referred to any neighborhood in particular. Woods Senior responded, "All of Dorchester, Roxbury, Mattapan. They all hoods."

was no evidence that the defendant had gang affiliations or that the crime had any gang-related motive.  Suggestions that the defendant grew up and lived in an area where there may have been gang activity implied only that he had a propensity to participate in gang violence.  These questions were improper.

d.  Photographs of Woods Junior's body.  The defendant maintains that four photographs of Woods Junior's body were improperly admitted.  Evidence is generally admissible if its probative value is not substantially outweighed by unfair prejudice.  Commonwealth v. Spencer, 465 Mass. 32, 48 (2013).  The photographs were relevant to the Commonwealth's case.  They depict shell casings near Woods Junior's body, which were later found to have been ejected from the same .40 caliber firearm used in the shooting of the Leonard and Mair.  The proximity of the shell casings to Woods Junior's body could have supported the inference that Woods Junior -- or someone close to him, including perhaps the defendant, who was also injured in the September shootout -- had used the weapon.  In turn, this supported the Commonwealth's theory that the firearm belonged to the defendant or one of his friends.  The judge was well within his discretion to conclude that the probative value of this evidence was therefore not substantially outweighed by unfair prejudice.  See Spencer, supra.

e.  November 16 arrest.  We discern no error in the testimony regarding the assignment[32] of the officer who arrested the defendant nor in the agreed-to instruction to the jury that the arrest "was unrelated to anything having to do with this case" and that the jury should not "draw any adverse inference against [the defendant] because he was the subject of [an] investigation that was not related to this case."

f.  Closing argument.  The defendant maintains that the prosecutor's closing argument was improper because, responding to defense counsel's argument that the defendant did not shoot Leonard because no gunshot residue was found in the defendant's mother's car, the prosecutor contended that no such residue would have been found because Mair testified that the shooter "got out of the passenger side and started shooting, swung the door open and started shooting."  "[C]ounsel may argue the evidence and the fair inferences which can be drawn from the evidence."  Commonwealth v. Sun, 490 Mass. 196, 221 (2022), quoting Commonwealth v. Hoffer, 375 Mass. 369, 378 (1978).  But he or she "should not misstate the evidence or refer to facts not in evidence."  Sun, supra, quoting Commonwealth v. Kozec, 399 Mass. 514, 516 (1987).  Here, Mair testified at trial that

---

[32] The officer briefly testified that, at the time of the arrest, he was assigned to the special operations unit, whose responsibilities included special weapons and tactics duties.

"[n]obody got out of the car" and that a light-skinned man opened the sedan's front passenger door and fired shots from a firearm in the direction of the Leonard and Mair.  Thus, the prosecutor's statement that Mair said the shooter "got out" of the vehicle was not faithful to Mair's words; still, the inference that the shooter at least leaned out of the car when he opened the passenger-side door was not contradicted by the evidence.[33]

Finally, we see no error in the prosecutor's argument that the defense witnesses' observations of two gunmen was not supported by the ballistics evidence.  Officers found only .40 caliber casings at the crime scene, later determined to be from a single firearm.  While the defendant correctly notes that experts testified that certain firearms, such as revolvers, do not eject casings, the prosecutor's assertion was not incorrect.

3. Conclusion.  The judgments are vacated, the verdicts set aside, and the matter is remanded to the Superior Court for a new trial.

So ordered.

---

[33] The prosecutor did not misstate the evidence in describing the gunshot residue expert's equivocal statements about whether officers might find residue in the interior of a vehicle.  The witness testified, "There's a wide variety of factors that come into play as to whether you will or will not find [gunshot residue] on a surface.  It's time, friction, washing of that surface.  So it's really very circumstantial based on the case at hand."